**Earl R. WISEMAN, District Director of U. S. Treasury Department, Internal Revenue Service, Appellant,**

v.

**HALLIBURTON OIL WELL CEMENTING COMPANY, a corporation, Appellee.**

No. 6563.

United States Court of Appeals Tenth Circuit.

April 5, 1962.

655

John B. Jones, Jr., Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and John J. Pajak, Attys., Dept. of Justice, Washington, D. C., and Paul W. Cress, U. S. Atty., Oklahoma City, Okl.,

and Leonard L. Ralston, Asst. U. S. Atty., Oklahoma City, Okl., on the brief), for appellant.

Duke Duvall, Oklahoma City, Okl. (Robert O. Brown and Robert E. Rice, Duncan, Okl., on the brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT, LEWIS, BREITENSTEIN and HILL, Circuit Judges.

PICKETT, Circuit Judge.

After payment of a deficiency assessment for 1955 income taxes, Halliburton Oil Well Cementing Company brought this action for a refund. The question presented is whether payments received under a contract pursuant to which Halliburton agreed to the termination of an exclusive license to use and to grant sublicenses for the use of a patented process in exchange for a non-exclusive license and one-third of the royalties received from third party licensees shall for income tax purposes be treated as ordinary income or as gain from the sale or exchange of a capital asset as contemplated by the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 1201–1202, 1221–1223. The trial court found that the income from the transaction was a capital gain, and entered judgment for Halliburton.

In a 1949 agreement Stanolind Oil and Gas Company granted to Halliburton the right to develop and use commercially, under the trade name "Hydrafrac Process," an unproven method, known as hydraulic fracturing, which it had invented for the creation and stimulation of production from oil and gas wells. Except for use by Stanolind and its affiliates, the agreement granted to Halliburton a nontransferrable right to use the Hydrafrac Process in the United States and foreign countries and, subject to the approval of Stanolind, to issue sublicenses to others for its use.[1] Halliburton agreed to pay

1. The agreement provided:
"Stanolind hereby grants Halliburton a right to grant sublicenses to third parties under Stanolind's Patent Rights for use of the Hydrafrac Process in countries in which Halliburton or one of

its Licensed Affiliates operates, and in connection therewith hereby grants Halliburton the right to inform such third parties of Stanolind's technique and know-how relating to the Hydrafrac Process, provided that Stanolind must

Stanolind a $100 royalty for each Hydrafrac job performed by Halliburton, its affiliates or sublicensees. The license was exclusive throughout the term of the agreement if, by March 1, 1951, the royalties paid and payable to Stanolind should total $300,000. This date was later changed by an amendment to the agreement.

At the time of the execution of the agreement, the process was in its experimental stages and had not been commercially developed and tested in the field. Under the terms of the agreement both Stanolind and Halliburton were to continue the development and improvement of the process, and Halliburton was to promote its use in the industry. Each party agreed to furnish the other with all technical information and data which would be of assistance to the other. The agreement was to remain in effect until the expiration of any patents issued to Stanolind relating to the process. Halliburton immediately entered into extensive laboratory work, developed special mechanical equipment, trained personnel, and devised safety methods. In the course of its operations, and through interchange of information, resulting from joint meetings of technicians and other means, Halliburton accumulated a great amount of technical ability with respect to the use of the process. Some of its work led to patents of its own. All of Halliburton's knowledge, including patents, was, by the terms of the agreement, available to Stanolind.

Within a comparatively short time the demand of the oil and gas industry for the use of the process exceeded all expectations. This demand became so great that Halliburton was unable to manufacture equipment and train personnel sufficient to meet the requests for the service. This situation induced a growing demand among Halliburton's oil well servicing competitors for a right to use the process. Halliburton doubted that it would be good business practice for it to license its own competitors, and did not desire to institute infringement proceedings against any of them. The situation became acute in 1952, and, at the request of Stanolind, the parties explored the possibility of Halliburton relinquishing its right to grant sublicenses thus permitting others to be licensed by Stanolind.[2]

agree in advance to the issue of each such license, and provided further that the royalty payable to Stanolind by Halliburton in each case shall be as defined in Paragraph 3.1 hereof."

2. Mr. Owsley, Senior Vice-President of Halliburton, testified:

"Q. Now then, directing your attention to the period late in 1952, just before Stanolind contacted Halliburton about the possible alteration of the status quo, is it fair to say that at that time the management of Halliburton was cognizant of this increasing demand and this partial inability to keep up with this demand? A. Yes, sir, we were. And one of the reasons that probably other companies started in on their own without licenses was because they knew we were keeping the trade waiting. We were quite seriously concerned about it, and we talked with Stanolind about it.

"Q. At that time, did you have any discussions within the company of the possibility of the issuance of sub-licenses by Halliburton? A. We did.

"Q. Who took part in those discussions? A. On at least one occasion, Mr. Meaders, Mr. Campbell, and myself, went to Tulsa and discussed those possibilities with Dr. Hawley, Mr. Lloyd Elkins, and Mr. George Roberts. That was roughly August of '52. We were concerned about how the business should be handled. It was suggested at that time that possibly a licensing arrangement might be the best way to go.

"Q. Who made that suggestion, sir? A. I'm rather sure that Stanolind brought the matter up, but it was openly discussed among all of us.

"Q. Did you form an opinion at that time on the desirability of having Halliburton itself issue sub-licenses? A. I sure did.

"Q. Did you communicate that opinion to anyone? A. Yes; we discussed it with the management here. I was in favor of some how or another getting enough personnel and enough equipment to operate to the full capacity, but I began to realize that it couldn't be done.

"Q. And at that point, did you consider whether Halliburton itself should issue sub-licenses? A. We did.

"Q. Did you form an opinion on that subject? A. Yes, sir.

"Q. And to whom did you communicate that, if anyone? A. Among the group

After extended negotiations an agreement was reached on June 10, 1953. By this agreement Halliburton terminated its right to an exclusive license under the 1949 agreement and accepted a non-exclusive license. It was agreed that Stanolind should have the irrevocable right to supply other licensees with the technical information and data relating to the use of the process which had previously been available only to Stanolind from Halliburton. In addition to the non-exclusive license, Halliburton was to receive a sum equivalent to one-third of the royalties which Stanolind received from licenses granted to third parties. In the year 1955, the tax year in question, this amount totaled more than $400,000, and in its income tax return for that year Halliburton reported this sum as proceeds from the sale or exchange of a capital asset. The Commissioner determined that these receipts should be treated as ordinary income, and assessed a deficiency. This action followed payment of the deficiency and the denial of a claim for refund.

The trial court was of the opinion that the transaction "was a sale and transfer of a substantial and valuable property right and capital asset, which had been developed from the crude stage into a perfected process with a great demand for it, and was at the time of the transfer substantially different from the original process and with a demand increased from practically zero to one almost universal in the oil fields." The trial court concluded that the 1953 transaction was not the mere cancellation or extinguishment of a contract right, and did not constitute a conversion of future income into present income.

Although third party licenses were contemplated by the terms of the 1949 agreement none had been issued. Consequently the 1953 agreement, except for permitting competition from others, had little or no effect upon Halliburton's situation as it then existed. In its argument, Halliburton assumes that it had no sublicensing rights at the time of the 1953 contract. The contract provisions and the testimony of its officers are to the contrary. It is true that sublicenses were subject to the prior approval of Stanolind, but it was Halliburton's own decision, "rightfully or wrongfully", not to grant them. The parties were in agreement that Halliburton could not satisfy the demand of the industry and that it was preferable that Stanolind issue the licenses. They recognized Halliburton's right to participate in the income from licenses issued to third persons. There was no way of estimating with any degree of accuracy the amount of this income in future years. This led to the provision that the receipts from this source should be divided on a percentage basis. The resulting change in the two contracts was that instead of Halliburton paying Stanolind $100 royalty for Hydrafrac jobs performed by Halliburton's sublicensees, Halliburton was to receive one-third of the royalty receipts of Stanolind under licenses it issued.

Admittedly all sums received by Halliburton from the use of the process in furnishing services under the 1953 license were ordinary income. Had Halliburton received any income from the

---

that I'm mentioning, Mr. Campbell, Mr. Meaders, Mr. McClendon; I'm sure there probably were others. I think Mr. Earl Halliburton was present at least once. We discussed the possibility of Halliburton offering other service companies sub-licenses, but in this service company business, it's rather rare to see one service company licensing another under various patents, as it's a pretty highly competitive situation. And we felt, rightfully or wrongfully, I don't know, we felt that that probably was not the way to solve the thing. Stanolind was aware of this discussion, too; we talked about it at great lengths.

"Q. So that it is fair to say that some time in 1952, the management of Halliburton decided that it would be better if Halliburton did not issue sub-licenses to its competitors? A. Why, I can't say that Halliburton on its own arrived at that decision; it was sort of a mutual thing between Stanolind and Halliburton during these numerous conferences.

"Q. But that was the consensus of opinion? A. Yes, sir, that, I believe, is correct."

granting of third party licenses under the 1949 agreement, that would have been ordinary income. It contends here, however, that the right to control the issuance of sublicenses was a property right, and that when it relinquished that right to Stanolind and accepted a percentage of the royalties which Stanolind received from third party licensees, the income resulted from a sale or transfer of a capital asset. No method is suggested by which a basis for the right transferred could be computed. The record indicates that substantially all costs of development were treated as expense rather than as capital investment made with the expectation of earning income in the future. The amount which Halliburton was willing to accept as royalty necessarily was based on what it could earn in the future under the exclusive arrangement. We think the royalty received by Halliburton under the 1953 agreement was no more than a substitute for future income which Halliburton would have received from granting third party licenses, had it chosen to exercise that right, and was not a return of capital. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Hort v. Commissioner, 313 U.S. 28, 61 S. Ct. 757, 85 L.Ed. 1168; Dyer v. Commissioner, 10 Cir., 294 F.2d 123; Commissioner of Internal Revenue v. Phillips, 4 Cir., 275 F.2d 33.

■■ The preferential treatment afforded by the capital gains provisions, 26 U.S.C.A. §§ 1201–1202, 1221–1223, was designed "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments * * *." Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L. Ed. 199. In Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617, the Court held that it was "the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." Commis-

sioner of Internal Revenue v. P. G. Lake, Inc., supra; Burnet v. Harmel, supra. To effectuate this Congressional purpose, the term "capital asset" is to be construed narrowly. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29.

Stanolind developed the process and obtained patent rights to it. These patents remained the property of Stanolind. All that Halliburton acquired in the 1949 agreement was the right to further develop and use the process. It is true that it had the right to grant third party licenses, but that could be done only with the approval of Stanolind. Its rights were dependent entirely upon the contract. The record, we think, is clear that in 1953 the existing contractual provisions were unsatisfactory to both parties, and they negotiated changes in the contractual situation for their mutual benefit. Halliburton gave up its right to future income from the granting of third party licenses, and substituted in its place a portion of the royalties which Stanolind would receive from exercising this right. As said in the Lake case, supra, 356 U.S. at page 266, 78 S.Ct. at page 695, "The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property." See Hort v. Commissioner, supra.

It is urged that this case is analogous to those which hold that the income from the sale or transfer of a leasehold interest in property is a capital gain, citing Commissioner of Internal Revenue v. Golonsky, 3 Cir., 200 F.2d 72, certiorari denied 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366; Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 2 Cir., 210 F.2d 752, certiorari denied 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Commissioner of Internal Revenue v. Goff, 3 Cir., 212 F.2d 875, certiorari denied 348 U.S. 829, 75 S.Ct. 52, 99 L.Ed. 654; We think it is more analogous to

Voloudakis v. Commissioner, 9 Cir., 274 F.2d 209, which holds that when a third party occupies a building pursuant to an agreement under which rentals are to be divided between the owner and a prior lessee the payments made to the prior lessee are ordinary income rather than capital gains. Cf. Chamberlin v. Commissioner, 7 Cir., 286 F.2d 850.

The case is not controlled by our decisions in Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, 10 Cir., 250 F.2d 503, or Jones v. Corbyn, 10 Cir., 186 F.2d 450. Dairy Queen is clearly distinguishable upon both law and fact. Jones v. Corbyn, where an insurance agency was sold intact as a going business and the income therefrom was not considered as having been derived from the termination of a contract giving rise to the right to receive future income, is premised in part upon broad reasoning which seemingly conflicts with the views expressed in the case at bar. To the extent such conflict may exist, we now rely upon the views herein expressed.

The judgment is reversed.