**M. Lloyd FREESE and Dorothy M. Freese, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 68–C–247.**

United States District Court,
N. D. Oklahoma.

Jan. 13, 1971.

E. John Eagleton and John M. Freese, Tulsa, Okl., for plaintiffs.

Ben Douglas and William W. Guild, Dept. of Justice, Tax Div., Fort Worth, Tex., and Robert P. Santee, Asst. U. S. Atty., Tulsa, Okl., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARROW, Chief Judge.

This matter was tried before the Court without a jury on December 7, 8, and 9, 1970, at Tulsa, Oklahoma. After considering the pleadings, stipulations of the parties, testimony, documents, and arguments of counsel, the Court makes and enters its findings of fact and conclusions of law as follows:

### Findings of Fact

1. This is a refund suit brought by Dorothy M. Freese, individually and as Executrix of the Estate of M. Lloyd Freese, deceased, plaintiff,* against the United States of America, defendant, for the recovery of income taxes and interest in the amount of $234,190.27, plus statutory interest.

2. The questions presented for determination are as follows:

(a) Whether a payment in the amount of $555,000 to the plaintiff in 1965 under an employment contract is taxable as ordinary income or as gain from the sale of a capital asset; and

(b) whether the plaintiff is entitled to certain deductions for alleged business expenses in the aggregate amount of $3,472.08 in 1965.

3. In 1918, Samuel L. Lubell, deceased, a New York manufacturer and investor, and another New York industrialist, Samuel Lamport, helped organize Bell Oil & Gas Company, referred to herein as Bell or Bell Company, for the purpose of engaging in the production and sale of oil and gas. Lubell and Lamport, jointly, invested $500,000 in the capital of Bell. Bell had a total capital of $1,000,000. By the early part of 1927, Lubell owned all of the shares of stock of Bell except for three qualifying shares. From that time until the liquidation of Bell in 1965, Lubell and members of his family and the family charitable foundation owned all of the stock of Bell.

4. In 1934, Bell employed M. Lloyd Freese, deceased, plaintiff, and one I. A. Anson, as excutives of Bell. Plaintiff and Anson had been jointly involved with Bell in the operations of another corporation, Altitude Petroleum Corporation, prior to that time. The employment contract, dated July 28, 1934, provided that plaintiff and Anson were to manage Bell's marketing division in consideration of a fixed salary of $800 per month, plus 25 percent of the net profits (or losses) of Bell's marketing and traffic departments. The contract provided, in part:

\* \* \* all of the duties hereby assumed by second parties [Anson and plaintiff] and the means and manner of accomplishing the same shall at all

---

\* M. Lloyd Freese, deceased, is referred to herein as "plaintiff." M. Lloyd Freese instituted this action and was joined by his wife, Dorothy M. Freese, because a joint income tax return was filed for the year in suit. Dorothy M. Freese, as Executrix of the Estate of M. Lloyd Freese, deceased, was substituted as a party plaintiff upon the death of M. Lloyd Freese.

times be subject to the control of first party [Bell].

In addition, the contract provided:

RELATION OF PARTIES. The relation of the parties hereto is principal as to first party [Bell] and agent severally as to each of the persons composing second parties [Anson and plaintiff]; and notwithstanding the provisions herein for sharing of profit and losses, nothing herein contained shall be construed as a relation of partnership or joint adventure between the parties, and second parties [Anson and plaintiff] shall not have the right to bind first party [Bell] as a partner or co-adventurer, either as between the immediate parties, or as to third persons; and all of the rights, duties and obligations of the parties hereto shall be measured and controlled by the principles applicable to the relation of principal and agent.

As part of the employment contract, plaintiff and Anson agreed to deposit with Bell $15,000 each to be kept on the books of Bell as a "reserve fund" in order to save Bell harmless on losses, if any, to be borne by plaintiff and Anson under the contract. Plaintiff and Anson were given 6 percent interest on the balances maintained in their respective accounts.

5. During the 1930's, Bell organized and purchased interests in various operations, including Solvex Refineries, Inc., and Bell General Pipe Line Company (successor in interest to Gilliland Pipe Line Company). Plaintiff and Anson also owned interests in Solvex and Bell General.

6. On February 1, 1938, plaintiff and Anson entered into separate employment contracts with Bell. Bell agreed to employ plaintiff as vice-president and plaintiff "accepted such employment" for a salary of $800 per month, plus 5 percent of the net profits (or losses). The net profits included any appreciation (or loss) realized by Bell from the sale of its assets. Under the employment contract, plaintiff agreed to allow his credit balance on the books of Bell to remain with the company as an "indebtedness" without interest. The amount credited to plaintiff under this contract was $66,386.70. This included the value of plaintiff's interests in Solvex and Bell General Pipe Line Company which were assigned to Bell.

Simultaneously with the execution of the 1938 employment contract, plaintiff and Anson entered into an agreement with Bell, in consideration of the new employment contracts, assigning all their interests in Solvex and Bell General to Bell. In addition, plaintiff and Anson surrendered and disclaimed any possible rights or interests they might have or claim in Bell or its assets.

7. On July 1, 1941, Bell and plaintiff entered into a new employment contract. Like its predecessors, this contract refers to the plaintiff as an employee and the continuing credit balance in plaintiff's account as an indebtedness owed by Bell. The 1941 contract, with modifications not material to this determination, remained in effect on a year-to-year basis until plaintiff's employment was terminated in 1965. Under the 1941 employment contract, plaintiff's compensation was increased to a fixed salary of $1,000 per month, plus 10 percent of the profits (or losses) of Bell. The net profits included any appreciation (or loss) realized by Bell from the sale of its assets. Plaintiff's credit on the books of Bell was subordinated to the rights of other creditors of Bell; however, his indebtedness was not subordinated to but rather had preferred treatment over the capital of the Lubell family in Bell.

8. Benedict Lubell, son of Samuel Lubell, deceased, became the chief executive officer of Bell in 1938. Later, upon the death of his father, Benedict Lubell succeeded as representative of the stockholders of Bell, that is, the Lubell family and the family foundation. In 1965, Benedict Lubell sold the assets of the company without any participation by the plaintiff.

9. The only relationship between plaintiff and Bell was that of employee and employer. Plaintiff was never a stockholder of Bell. He did not attend and was not invited to attend stockholders' meetings of Bell. Plaintiff was never a member of the board of directors of Bell. Plaintiff was never a signatory on the checking accounts of Bell, and did not sign checks of Bell. Under the employment contracts, plaintiff was chargeable with a percentage of losses, if any; however, his liability in this respect was limited to the balance in his account on the books of Bell. Even if the plaintiff's liability for his percentage of the losses were not so limited, this factor in and of itself would not make the plaintiff an owner of an interest in Bell or its assets.

10. Under the 1941 employment contract, plaintiff had the right to arbitrate the value of the assets of Bell in determining his 10 percent profits from the sale of such assets upon the liquidation of Bell. On June 25, 1965, after Benedict Lubell had negotiated the sale price of the assets of Bell, plaintiff and Bell entered into a Compromise Agreement whereby plaintiff accepted $555,000 as full and complete payment of his profits in Bell. Approximately $20,000 of this payment represented the balance of plaintiff's profits in the operations of Bell and the remainder represented his 10 percent of the profits realized by Bell from its sale of the assets.

11. On June 30, 1965, plaintiff left Bell. During the remainder of 1965, plaintiff held himself out as a consultant in the oil and gas industry. In this connection, plaintiff incurred the following expenses:

| | |
|---|---|
| Travel | $ 544.89 |
| Gifts | 328.33 |
| Entertainment | 1,370.23 |
| Automobile | 1,228.63 |
| Total | $3,472.08 |

12. Plaintiff filed an income tax return for the year 1965 in which he reported the $555,000 payment as income from his "sale of assets." Plaintiff reported his cost basis in these assets as $17,900. The $17,900 represented attorney's fees and accountant's fees incurred by the plaintiff in 1965 in connection with his negotiation of the settlement with Bell. Thus, plaintiff in his income tax return reported no original cost basis (investment) in the assets.

13. Upon audit of the plaintiff's income tax return for 1965, the Commissioner determined that the $555,000 payment was compensation for services rendered to Bell and taxable as ordinary income. The Commissioner also disallowed the deductions claimed by plaintiff as business expenses in the amount of $3,472.08.

14. The Court finds that the plaintiff did not own any interest in Bell or in any of its assets, and that the plaintiff was not a joint venturer or partner with Bell in its operations. The Court finds that the plaintiff was an employee of Bell and that he received the payment of $555,000 in 1965 as compensation for services rendered to Bell. The Court agrees with the Commissioner that the $555,000 payment is not entitled to treatment under the capital gain provisions of the Internal Revenue Code.

15. Further, the Court finds that the plaintiff held himself out as a consultant in the oil and gas industry in 1965 and that he is entitled to a deduction of the disputed business expenses. In this connection, the plaintiff is entitled to a refund of income taxes in the amount of $2,430.45, and assessed interest in the amount of $209.38, plus statutory interest thereon. In all other respects, the claims of the plaintiff are denied.

### Conclusions of Law

1. The Court has jurisdiction of this action and the parties under Section 1346(a) (1), 28 U.S.C.

2. The capital gains provision of the Internal Revenue Code of 1954 is an alternative tax computation available to taxpayers only with respect to income derived from the sale or exchange of a capital asset. Section 1201, Internal Revenue Code of 1954. The basic require-

ments for reporting income as capital gain are that there be a "sale or exchange" of a "capital asset" in which the taxpayer has an investment. Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (C.A.5, 1960); Holt v. Commissioner of Internal Revenue, 303 F.2d 687 (C.A.9, 1962). The burden rests with the taxpayer who seeks to bring himself within the statutory provision permitting capital gains treatment. Spangler v. Commissioner of Internal Revenue, 323 F.2d 913 (C.A.9, 1963).

In the instant case, plaintiff has failed to sustain his burden of proof that he owns such an interest in either Bell or its assets as to entitle him to treat the profits from the sale of the assets as capital gains.

■ 3. Compensation for services rendered constitutes ordinary income under Section 61(a) of the Internal Revenue Code of 1954. Pounds v. United States, 372 F.2d 342 (C.A.5, 1967). A lump sum payment made as a substitute for what would otherwise be ordinary income remains ordinary income. Specifically, lump sums received in satisfaction of what is in reality compensation under an employment contract constitute ordinary income. Clark v. United States, 341 F.2d 691 (C.A.9, 1965); Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654 (C.A.10, 1962); Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929 (C.A.5, 1963); United States v. Eidson, 310 F.2d 111 (C.A.5, 1962); General Artists Corp. v. Commissioner of Internal Revenue, 205 F.2d 360 (C.A. 2, 1953); Copeland v. Ratterree, 57–2 U.S.T.C., par. 9895 (N.D.N.Y., July 23, 1957).

■ 4. The terms of the contract control the tax effect to be accorded the transaction, and the taxpayer is bound by the form in which he casts his transactions. Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (C.A.3, 1967), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967).

■ The Court finds that there is no ambiguity in the contracts between Bell and plaintiff. Terms of the 1941 contract of employment, as well as the previous contracts between Bell and plaintiff, set out the relationship between Bell and plaintiff as that of employer and employee, respectively. Furthermore, the subject employment contracts clearly characterized the funds advanced by plaintiff to Bell as indebtedness, not capital.

5. The Court concludes that the payment from Bell to plaintiff in the amount of $555,000 in 1965 represented compensation for services rendered and, as such, the payment is taxable as ordinary income.

■ 6. The Court concludes that plaintiff is entitled to deduct expenses incurred by him in 1965 in connection with his business as an oil and gas consultant under Section 162 of the Internal Revenue Code of 1954.

7. Any finding of fact which is deemed to be a conclusion of law is hereby adopted as a conclusion of law.

8. Judgment will be entered accordingly.