M. Lloyd **FREESE** and Dorothy M. Freese, Plaintiffs-Appellants,

v.

**UNITED STATES of America,** Defendant-Appellee.

No. 71–1193.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1972.

Rehearing Denied April 10, 1972.

---

E. John Eagleton and John M. Freese, Tulsa, Okl., for plaintiffs-appellants.

Issie L. Jenkins, Atty., Tax Division, Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Paul M. Ginsburg and Jane M. Edmisten, Attys., Tax Division, Dept. of Justice, Washington, D. C., Nathan G. Graham, U. S. Atty., Tulsa, Okl., of counsel, Robert P. Santee, Asst. U. S. Atty., Tulsa, Okl., and Ben Douglas and William W. Guild, Attys., Tax Division, Dept. of Justice, Fort Worth, Tex., on the brief), for defendant-appellee.

Before LEWIS, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This cause is a tax refund suit in which Dorothy M. Freese, as executrix of the estate of M. Lloyd Freese, deceased, seeks to recover income taxes and interest in the total amount of $234,190.-27. The action revolves around a lump sum payment totaling $555,000 received by M. Lloyd Freese in 1965, pursuant to a contract of compromise and settlement. The demand of plaintiff represents the difference between ordinary income on which the tax was paid and the amount of tax payable under capital gain treatment. Freese maintains that the sum distributed was not ordinary income, and it is this issue which we must determine.

The district court, 323 F.Supp. 1194, held that M. Lloyd Freese had been an employee of Bell Oil & Gas Company throughout the period; that this payment represented accumulated commissions; and that since the relationship was one of employer-employee all of the amount paid was compensation for services rendered and, therefore, was taxable as ordinary income.

Although the final contract, as amended, between the parties which was executed in 1941 seems definitive as to the property interest which Freese had in the Bell Oil & Gas Company prior to its sale in 1965 (to L & V Company for a sum in excess of $10,000,000), it is necessary to at least summarize the background facts in order to review the question as to whether the mentioned distribution was a capital asset subject to the capital gains provisions of the Internal Revenue Code.

The Bell Company was organized in 1918 by Samuel L. Lubell, a New York manufacturer and investor, and Samuel Lamport, for the purpose of engaging in the production and sale of oil and gas. Lubell and Lamport invested $500,000 each in this company and owned all of the shares of stock with the exception of a few qualifying shares. Subsequently, Lubell acquired all of the stock, and during the periods here in question Lubell and members of his family, together with a charitable foundation, owned the Bell stock.

During the early period of the Bell Company Freese and one I. A. Anson were also engaged in the oil and gas business in Oklahoma. They had organized the Altitude Petroleum Corporation which had competed with Bell, but which later merged with and became in substance the marketing division of Bell. A new Altitude Corporation was formed and the stock was issued to Bell. From the very beginning Freese and Anson were regarded and treated as employees. For example, a 1928 agreement provided in part:

It is contemplated that a Corporation be organized by First Party (Bell) * * * and that second parties (Anson and taxpayer) shall be placed in charge of the said business upon profit sharing plan * * * (Appendix, p. 220).

Freese and Anson were at all times subject to the control of Bell even though they were employed to deal on behalf of Altitude. They received $700.00 per month plus 25 percent of the net profits derived from the business, but they were not allowed to make advance drawings on either salary or profits. Bell controlled the extension of credit by Altitude and also the collections by Altitude.

The 1934 employment contract provided for a reserve fund to protect Bell against losses suffered by Altitude under the management of Freese and Anson. In subsequent contracts the amount of the initial required deposit was increased somewhat and profits were credited to this account. To a limited extent Freese was allowed to draw down some of these profits, and he reported and paid income taxes annually on the amount which had been credited to his account. In 1934 Bell entered into a new contract with Freese and Anson which provided in part:

Second parties were heretofore employed by ALTITUDE PETROLEUM CORPORATION, engaged in the marketing of petroleum products. It is the intention of those interested in the ALTITUDE PETROLEUM CORPORATION to liquidate its business, pay all of its liabilities, declare liquidating dividends from time to time, and dissolve such corporation.

It is further contemplated that ALTITUDE PETROLEUM CORPORATION shall cease doing business and any unfinished profitable contracts belonging to it will be transferred and assigned to first party. Thereafter first party will employ each of the persons composing second parties for the purpose of managing its Marketing Department upon terms and considerations presently to be stated.

It continued:

1. *OBJECT OF EMPLOYMENT.* First party does by these presents employ severally each of the persons composing second parties and the latter hereby accept the said employment for the term and for the considerations hereinafter stated.

Money furnished by Freese and Anson to the Marketing Department of Bell thenceforth earned six percent interest.

They were treated as managing agents, but the contract specifically provided for them to be subject to the control of Bell. They were given a 25 percent share of the profits of the Marketing Department or Division of Bell. At the same time, they were made individually and severally liable for 25 percent of losses incurred, and the mentioned reserve fund in the initial amount of $50,000 was continued. A contract provided for the make up of this reserve fund, but the specifics of this are not relevant to the present inquiry. Following the establishing of the $50,000 fund Freese was to be paid profits realized on a monthly basis, and also interest at the rate of six percent was credited to the reserve account.

Although both Anson and Freese were made vice-presidents of Bell, Section 21 of the contract read:

> The relation of the parties hereto is principal as to first party and agent severally as to each of the persons composing second parties; and notwithstanding the provisions herein for sharing of profit and losses, nothing herein contained shall be construed as a relation of partnership or joint adventure between the parties, and second parties shall not have the right to bind first party as a partner or co-adventurer, either as between the immediate parties, or as to third persons; and all of the rights, duties and obligations of the parties hereto shall be measured and controlled by the principles applicable to the relation of principal and agent.

The length of this contract was 10 years. However, there was a right to terminate on 90 days' notice in the event gross profits fell below the level achieved on a monthly average from June 1, 1933 to June 1, 1934 during any consecutive six-month period after February 1, 1935.

Still another agreement was entered in 1938 changing the share of profits from 25 percent of the Marketing Department to five percent of the total net profits of Bell including "income from investments, dividends and sale of assets, as well as the income from the normal business operations conducted by first party" (Bell). This 1938 agreement also contained an assignment by Freese and Anson to Bell of all right and title to property that they might have acquired in prior agreements when they were in the Marketing Department of Bell.

The final agreement and the one with which we are here concerned was entered into on July 1, 1941. Bell again "employed" Freese as a vice-president. His remuneration was increased to $1,000 per month and ten percent of all profits earned by Bell, again including income from investments, dividends and sales of assets as well as income from the normal business operations conducted by Bell. He was again made liable for ten percent of any net loss.

The indebtedness owed Freese by Bell "as represented by Freese's credit balance on the books of Bell" was again subordinated to "the rights of any and all other creditors of Bell except only any indebtedness due and owing from Bell to I. A. Anson, and except any other indebtedness due and owing from Bell to any other of its employees or officers for services rendered * * *." As he had been theretofore, Freese was given the right to require arbitration of the value of assets in the event of dissolution or liquidation of Bell, to the end of properly determining the amount due to him under the provisions previously outlined.

We gather from a study of the record in this case that assets of various kinds were sold and profits were realized and credits were given during the years subsequent to 1941 until 1965. As previously noted, Freese paid his taxes on these items each year and he treated them as ordinary income. We are not here concerned with any of these transactions.

It was in 1965 that the assets of Bell were sold to L & V Company for a total in excess of $10,000,000. Freese did not take any part in the negotiations leading to this sale, but he was asked to be liable for ten percent of any liabilities which arose pursuant to the sale. This request was later abandoned.

On June 25, 1965, Freese and Bell entered into the compromise settlement which provided for the $555,000 payment. This agreement recited that it was the product of a good faith controversy between Freese and Bell as to the amount that would be due him under the previous agreement upon consummation of the sale of Bell to L & V. Freese accepted the $555,000 as full and complete payment, satisfaction, compromise and settlement of every sum due under the agreement.

The basic relationship of employer-employee threads through all of the contracts and pervades most of the acts and doings of the parties. Each and every contract emphasized that Freese was an employee and not an owner because he owned no stock in the company at any time; his closest approach to owning an asset arose from his ten percent interest in the profits realized from the sale of corporate assets. Thus, he had the right to the increment in the value of the assets from the time of his contracts and by reason of this fact he claims that the property awarded to him was a capital asset (pursuant to 26 U.S.C. § 1221) subject to the rate applicable to long-term capital gain. An alternative contention is that if this sum is determined to be ordinary income, he at least is entitled to utilize the averaging provisions of § 1301 of the 1954 Internal Revenue Code in accordance with pre-1964 Treasury Regulations § 1.1301a–1. This latter issue was not raised before the trial court and is before us for the first time on this appeal.

The district court found that the only relationship between plaintiff and Bell was that of employee-employer.[1]

The court concluded that the sum involved did not qualify as a capital asset despite the fact that it was paid in a lump sum; that it was compensation for services rendered and was thus ordinary income.

We agree with the findings and conclusions of the district court and affirm its judgment.

I.

A threshold principle is that in order for a transaction to be ruled a capital gain, it must bring itself within either 26 U.S.C. § 741 (partnership interest) or 26 U.S.C. §§ 1221 and 1222 (the basic capital gains provisions) and as such must involve a "capital asset" which is defined in § 1221 to be property held by the taxpayer. In analyzing and correlating the evidence and law we are mindful that the Supreme Court has held that the term "capital asset" is a narrow category and under the congressional scheme an exception rather than the rule for the treatment of income.[2]

In light of the above, the taxpayer's contention that the relationship

---

1. The court found:

"* * * Plaintiff was never a stockholder of Bell. He did not attend and was not invited to attend stockholders' meetings of Bell. Plaintiff was never a member of the board of directors of Bell. Plaintiff was never a signatory on the checking accounts of Bell, and did not sign checks of Bell. Under the employment contracts, plaintiff was chargeable with a percentage of losses, if any; however, his liability in this respect was limited to the balance in his account on the books of Bell. Even if the plaintiff's liability for his percentage of the losses were not so limited, this factor in and of itself would not make the plaintiff an owner of an interest in Bell or its assets."

The court continued:

"10. Under the 1941 employment contract, plaintiff had the right to arbitrate the value of the assets of Bell in determining his 10 percent profits from the sale of such assets upon the liquidation of Bell. On June 25, 1965, after Benedict Lubell had negotiated the sale price of the assets of Bell, plaintiff and Bell entered into a Compromise Agreement whereby plaintiff accepted $555,000 as full and complete payment of his profits in Bell. Approximately $20,000 of this payment represented the balance of plaintiff's profits in the operations of Bell and the remainder represented his 10 percent of the profits realized by Bell from its sale of the assets."

2. Corn Products Refining Co. v. C. I. R., 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955). See also Hort v. C. I. R., 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); C. I. R. v. P. G. Lake, Inc., 356

was that of copartnership or joint venture makes slight impact. For such a relationship to exist there must have been an intent among the parties involved to form it; the unambiguous terms of the agreement evidence no such intent. Furthermore, there is not the slightest suggestion that the 1941 agreement or any of its predecessors was a sham which sought to conceal or obscure the actual relationship of the parties. All of these contracts emphasize that Bell was an employer and at least one of these disavowed expressly that there was a partnership. Apart from this, the total circumstances fail to reveal that the actual relationship had any joint venture quality about it such as was contemplated by the Supreme Court in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949), wherein the Court said:

> The question is * * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

It is unnecessary then to analyze the relationship in detail since it is clear that there is neither a copartnership nor joint venture under any of the standards set forth in *Culbertson*, the expressions in which are still applicable to instances of non-family relationships.

## II.

■ We have not been content to be governed by the express terms of the contract describing the relationship as employer-employee in deciding whether the distribution qualified as a capital asset. We have proceeded to examine the history and nature of the property itself in an effort to determine its intrinsic nature and character. Regardless of how the matter is considered, we find that its inherent quality is that of deferred commissions and profits. In short, it was an employee profit sharing program. Freese was not granted a ten percent interest in the Bell Corporation. Instead, he received a ten percent interest in the increased value of assets. True, he was extended the right to insist upon careful evaluation and arbitration of that evaluation following disagreement, but even then the ultimate arbitration was final.

Nor do we agree that Freese's "bundle of rights" gave to this property the quality of a capital asset. The fact that the fund finally had considerable magnitude accumulated over a long period of time, while significant, is not determinative. Nor does the fact that the taxpayer had rights in connection with the computation of the profits attributable to the sale of assets change its quality. Nor can we give weight to the fact that he was a vice-president [3] or acting in a managing capacity. None of these incidents changes the fact that this distribution was made up of commissions and earnings. It remained compensation, even though attributable to the sale of corporate assets of various kinds. The fact of deferment and accumulation cannot change this basic nature or quality.

In Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir. 1962), a similar contention was advanced. The court found two aspects of an entertainment contract to have the quality of capital assets. Ferrer had a lease on a play which he was to perform, created by an advance of $1,500. Incident there-

U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960).

3. After all, in this day and age the corporations appoint vice-presidents for various reasons and purposes.

to, he had a negative power to prevent the sale of motion picture, radio and television rights until after production of the play. The court held that this latter was a capital asset subject to capital gain treatment on the occasion of his surrender of these rights. The control by Ferrer, however, of the asset was clear. The court pointed out that it was like a lease of land for a term. Freese did not have this kind of ownership. The fact that Ferrer had control over the asset does not furnish a favorable guide to Freese in the case at bar because the latter had no control in the sense that he could determine the time and circumstances of a sale.

This court's decisions have, in accordance with decisions of the Supreme Court, given a narrow construction to the term "capital asset." Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654 (10th Cir. 1962) was a lump sum payment case. It was made in exchange for surrender of the right to grant sub-licenses and realize future earnings. This right was held to be nothing more than ordinary income. There the court said:

> * * * It contends here, however, that the right to control the issuance of sublicenses was a property right, and that when it relinquished that right to Stanolind and accepted a percentage of the royalties which Stanolind received from third party licensees, the income resulted from a sale or transfer of a capital asset. No method is suggested by which a basis for the right transferred could be computed. The record indicates that substantially all costs of development were treated as expense rather than as capital investment made with the expectation of earning income in the future. The amount which Halliburton was willing to accept as royalty necessarily was based on which it could earn in the future under the exclusive arrangement. We think the royalty received by Halliburton under the 1953 agreement was no more than

a substitute for future income which Halliburton would have received from granting third party licenses, had it chosen to exercise that right, and was not a return of capital. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Hort v. Commissioner [of Internal Revenue] 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Dyer v. Commissioner [of Internal Revenue] 10 Cir., 294 F.2d 123; Commissioner of Internal Revenue v. Phillips, 4 Cir., 275 F.2d 33.

301 F.2d at 658.

*Halliburton* has precedential value here in that the interest involved there came much closer to qualifying as a capital asset than does the property with which we are here concerned; the income was nevertheless held to be ordinary. And, although *Halliburton* is not irreconcilable with *Ferrer*, the opinions and results in the two cases are somewhat at variance. Our holding here is agreeable to both cases.

Elliott v. United States, 431 F.2d 1149 (10th Cir. 1970) is similar in effect to *Halliburton*. In *Elliott* the taxpayer received the sum of $49,000 from his insurance company upon the termination of his contract. These monies were characterized as reimbursement for loss of future earnings and as such taxable as ordinary income. The sole right surrendered by the taxpayer was his contract right to continue as General Agent for the company.

In the case at bar we do not have the element of surrender of rights to future earnings or income. Freese was paid a lump sum composed of his ten percent commission on the sale of assets in accordance with his contract of employment. The settlement carries no significant legal consequence here, since it was simply an agreement arising from a dispute as to the amount which was due him. The only "right" which Freese gave up for present purposes in this connection was his contract right to an arbitration.

■ As we previously noted, the payments which were made or credited to Freese through the years had been treated as ordinary income by both Freese and the company. Although this is not dispositive of the question, it evidences the viewpoint of the parties through the years. We are of the opinion that the district court was correct in holding that this was income which did not differ in character from the payments and credits of prior years.

### III.

■ The final question is whether the Freese estate should now be allowed to take advantage of the income averaging provisions of the Internal Revenue Code and the regulations. The impediment to consideration of this question is that it is raised for the first time on appeal. A necessary prerequisite to maintaining an action for refund is the filing of a claim. See § 7422 of the Internal Revenue Code. The purpose of requiring that there be a fair presentation of the claim to the Internal Revenue Service is so as to avoid surprises. Flora v. United States, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958); United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); Herrington v. United States, 416 F.2d 1029 (10th Cir. 1969); see 10 Mertens, Law of Federal Income Taxation, 1966 Revision § 58A.06.

To take up this matter now would be to make factual determinations which were not presented to the district court. This we cannot do.[4]

The taxpayer's contention that he was not able to press the income-averaging issue until he had exhausted all possibilities of establishing his right to capital gain treatment is something less than a compelling basis. Therefore, we must deny the present request that the cause be remanded for determination of the

applicability of § 1.1301a–1 of the regulations.

The judgment of the district court is affirmed.

---

4. The income-averaging provisions require, before a taxpayer may come thereunder, that he show that he (1) was engaged in employment; (2) for a period of over 36 months, and (3) received 80 percent of his total compensation for such employment in the lump sum questioned. Pre-1964 averaging provisions, T.R. 1.1301a–1. Clearly number (3), at least, would involve the making of factual determinations which could become, in this case, quite complex.