ROBERT AND ANN ROTHSTEIN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

EUGENE AND LOIS COLE, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 11535-85, 19524-86.    Filed March 30, 1988.

*Leonard Bailin* and *William Seplowitz,* for the petitioner.
*Steven Z. Ettinger,* for the respondent.

WELLS, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 11535-85 | Robert and Ann Rothstein | 1982 | $565,539 |
| 19524-86 | Eugene and Lois Cole | 1982 | 225,990 |
|  |  | 1983 | 5,029 |

In addition, respondent determined that petitioners in docket No. 19524-86 were liable for additions to the tax as follows:

| Year | Sec. 6653(a)(1) [1] | Sec. 6653(a)(2) | Sec. 6661(a) |
|------|---------------------|------------------|--------------|
| 1982 | $11,299.50 | (*) | $22,599.00 |
| 1983 | 251.50 | (*) | 502.90 |

*50 percent of the interest due on the underpayment.

After concessions, the issues remaining for decision are (1) whether payments received by petitioners Robert Rothstein and Eugene Cole in 1982, pursuant to an employment agreement, are taxable as ordinary income or as income from capital gains; and (2) whether petitioners Eugene and Lois Cole are liable for additions to the tax pursuant to section 6661(a) for 1982 and 1983.[2]

## FINDINGS OF FACT

Some of the facts are stipulated. The stipulation of facts and exhibits thereto are incorporated herein by this reference. Petitioners in docket No. 11535-85 (the Rothsteins) resided in North Bergen, New Jersey, when they filed their petition herein. Petitioners in docket No. 19524-86 (the Coles) resided in Oyster Bay Cove, New York, when they filed their petition.

Petitioners Robert Rothstein and Eugene Cole were employed by Royal Paper Corp. (Royal) from prior to January 1, 1973, until December 31, 1981.[3] At all times relevant hereto, Leonard Baron (Mr. Baron) was chief executive officer and the sole common shareholder of Royal.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The notice of deficiency issued to the Rothsteins (petitioners in docket No. 11535-85) appears to contain a computational error. Explanatory pages in the notice of deficiency suggest that respondent intended to decrease the Rothsteins' capital gain income to account for respondent's recharacterization of the payments at issue from capital gain income to ordinary income. The summary page in the notice of deficiency, however, erroneously computed the amount of the deficiency based on a substantial increase, rather than a decrease, of the Rothsteins' capital gain income. Respondent's brief states that respondent agrees that "should the Court determine that the amounts at issue were taxable to petitioners as ordinary income, [the Rothsteins] would be entitled to an offset for the amount of taxable capital gain reported on their 1982 return, in the amount of $253,061.00." We take that as a concession that the calculation in the notice of deficiency was an error and that the Rothsteins' capital gain income should be decreased by $253,061 if we find that the payments constituted ordinary income.

[3] Ann Rothstein and Lois Cole are petitioners in the instant cases solely by virtue of filing joint returns with their husbands. The only issues herein relate to the employment of Mr. Rothstein and Mr. Cole, and hereinafter we shall refer to Mr. Rothstein and Mr. Cole individually as petitioners.

Historically, Royal had been a family business with several members of the Baron family involved in the management of the business. After the death of one of Mr. Baron's uncles, however, Mr. Baron was left by himself to manage Royal. Royal's business was expanding and Mr. Baron needed help to run the business. Consequently, Mr. Baron, in 1972, asked petitioners to help him run the business as executives. Mr. Cole expressed a desire to "become a partner in the corporation"; however, he did not have the "kind of money that it would take to buy the assets or a share of the assets."[4] Petitioners and Mr. Baron (acting on behalf of Royal) had subsequent discussions and negotiations, and a tentative agreement was drafted to provide for petitioners' duties and rights as executives of Royal. Mr. Rothstein had his attorney review the proposed agreement.[5] Petitioners subsequently each entered into identical agreements with Royal, effective January 1, 1973. (Those agreements hereinafter will be referred to as the employment agreements.) The employment agreements contained the following provisions:[6]

3. *Compensation*

As full compensation for his Services under this agreement in any capacity, the Executive shall be entitled to receive the following:

(a) *Salary* * * *

(b) *Profit Sharing* * * *

(c) *Share of Proceeds Upon Sale of Stock or Assets.* If at any time during the term of the Executive's employment by the Company or within six months after termination of his employment, the Company sells substantially all of its assets or Leonard B. Baron and all other stockholders in the company sell, in a single transaction or a related series of transactions, all of the shares in the company owned by them (other than in connection with a redemption of the shares by the Company or a sale to any stockholder of the Company or to any stockholder's relatives), the Executive shall be entitled to receive as additional compensation an amount equal to 12½% of the amount, if any, by which the Sales Price (as defined in paragraph 3(e) below) exceeds $825,000.

---

[4] The record does not indicate whether Mr. Rothstein had sufficient funds to purchase a share of the assets at that time.

[5] The record does not indicate whether any attorney examined the proposed agreement on behalf of Mr. Cole.

[6] On Dec. 3, 1976, and May 8, 1979, minor amendments were made to the employment agreements; however, those amendments did not alter the provisions that are material to our decision.

\*    \*    \*    \*    \*    \*    \*

(e) *Additional Provisions Relating to Profit Sharing and Sale of Assets or Stock.* \* \* \*

(i) \* \* \* As used in paragraph 3(c) the term "Sales Price" means the gross proceeds received by the seller from the purchaser with the following adjustments:

(A) the fair market value, as of the date of the closing of the sale, of all land and buildings sold (directly or indirectly by sale of stock), less the amount of any mortgage liability thereon, shall be deducted (such value shall be determined by the Company's independent certified public accountants whose determination shall be final and binding);

(B) the amount of the liquidation preference on the Company's preferred stock to the date of the closing of the sale shall be deducted;

(C) all of the expenses incurred by the sellers in connection with the sale (including attorneys' and accountants' fees) shall be deducted; and

(D) in any transaction involving a sale of assets, appropriate adjustment shall be made to reflect the net amount of any accounts receivable and other assets (other than land or buildings) not included in the sale and the amount of any liabilities (other than those relating to land and buildings) not assumed by the purchaser.

\*    \*    \*    \*    \*    \*    \*

(vii) Nothing in this paragraph 3 shall (A) give the Executive any right to continue in the employ of the Company or prevent the termination of the Executive's employment in accordance with this agreement, whether or not negotiations for any sale of stock or assets of the Company are then pending, (B) limit the right of the board of directors to manage the business and affairs of the Company (including the determination of the nature and amount of the obligations and liabilities incurred by the Company, the products and services offered by the Company, and the price charged by the Company for its products and services), (C) give to the Executive any claim against the Company or any of its officers or directors with respect to any decision relating to the conduct of the Company business, whether or not that decision affects the share of profits and other compensation to which the Executive is entitled under this agreement, or (D) limit the right of the Company or any subsidiary, or any of the Company's shareholders, to determine in its or his sole and absolute discretion the terms of any sale of stock or assets of the Company or any subsidiary or give the executive any right to participate in the negotiations regarding any proposed sale.

The terms of the employment agreements contained no provisions requiring petitioners to make payment to or execute any promissory note in favor of either Royal or Mr. Baron. Petitioners also had no liability for any decrease in the value of Royal's stock or assets. The agreements contained no provision whereby stock certificates would be

issued to petitioners, but they also contained no provision specifically stating that petitioners had no equity interest in Royal. No stock certificate and no other evidence of equity interest in Royal ever was issued to either petitioner.

The employment agreements were for a duration of 3 years and provided for automatic 3-year renewals in the absence of one of the parties' giving notice of intent to terminate the agreement. Pursuant to those terms, the employment agreements renewed automatically for the 3-year periods ending on December 31, 1978, and December 31, 1981. On October 13, 1981, Royal notified petitioners of its intent to terminate the employment agreements effective December 31, 1981.

On December 31, 1981, Royal and three related corporations, as sellers, entered into an asset purchase agreement with WWF Paper Corp. (WWF), as buyer, whereby WWF would purchase assets from the other corporations as of January 1, 1982. Pursuant to the asset purchase agreement, WWF acquired substantially all of the assets of Royal and the other seller corporations.

A dispute arose as to the amount owed to petitioners on account of Royal's sale of its assets. In June 1982, petitioners each brought suit against Lenbar Enterprises, Inc., the successor corporation to Royal which was owned by Mr. Baron. On or about September 16, 1982, the parties to that suit reached a settlement of the suit and executed stipulations discontinuing the action. Pursuant to the settlement, each petitioner in 1982 received $627,866 pursuant to paragraph 3(c) of his employment agreement.

## OPINION

We are asked to decide whether the payments received by petitioners pursuant to the employment agreements represent ordinary income or capital gains. Petitioners argue that the purpose and intention of the parties' entry into the employment agreements was to create in petitioners an interest equivalent to an equity interest in Royal, so that the payments received by petitioners were amounts derived from the sale or exchange of a capital asset, namely, petitioners' equity interest in Royal. Respondent, on the other hand, maintains that the rights created by the

employment agreements were not capital assets, so the payments at issue represent ordinary income.[7]

A transaction must involve the sale or exchange of a capital asset in order for the transaction to yield capital gain. Sec. 1222. Section 1221 defines the term "capital asset," but that section does not list what types of property are capital assets; section 1221 only itemizes categories of property which specifically are not capital assets. The Internal Revenue Code contains no specific provision regarding the characterization of an employment contract for purposes of capital gains.

The crux of the issue before us is whether the employment agreements were merely employment contracts or whether the agreements gave petitioners something equivalent to an equity interest in Royal, the sale of which constitutes a sale or exchange of a capital asset. Respondent determined that the payments at issue were merely payments pursuant to employment contracts which are taxable to petitioners as ordinary income. Unless petitioners show that their employment agreements accorded them an equity interest in Royal, it is clear that we must uphold respondent's determinations because "courts have quite uniformly held that contracts for personal services are not capital assets and that the proceeds from their transfer or termination will not be accorded capital gains treatment but will be considered ordinary income." *Vaaler v. United States,* 454 F.2d 1120, 1122 (8th Cir. 1972). See also *Maryland Coal & Coke v. McGinnis,* 350 F.2d 293 (3d Cir. 1965); *Gordon v. Commissioner,* 262 F.2d 413 (5th Cir. 1958), affg. 29 T.C. 510 (1957); *General Artists Corp. v. Commissioner,* 205 F.2d 360 (2d Cir. 1953); *Lozoff v. United States,* 266 F. Supp. 966, 970 (E.D. Wis. 1967), affd. per curiam 392 F.2d 875 (7th Cir. 1968).

Petitioners counter that the employment agreements were more than merely employment contracts because the purpose and intent of the parties to the employment agreements was to create rights equivalent to an equity interest in Royal in favor of petitioners. Petitioners' briefs, however,

---

[7]As respondent notes, the provisions of sec. 83 are inapplicable to the payments at issue because the rights under the employment agreements were, at most, unfunded, unsecured promises to pay money in the future. As such, the rights are not property for purposes of sec. 83. See sec. 1.83-3(e), Income Tax Regs.

cite no cases whatsoever in support of that argument.[8] The only authority cited by petitioners on this issue are section references from the New York State corporation laws.[9] Even if the employment agreements might have been property for purposes of State law, they are not necessarily considered capital assets for purposes of the capital gains provisions. *Commissioner v. Gillette Motor Transport, Inc.,* 364 U.S. 130, 135 (1960); *Burnet v. Harmel,* 287 U.S. 103, 110 (1932); *Shuster v. Helvering,* 121 F.2d 643, 645 (2d Cir. 1941), affg. 42 B.T.A. 255 (1940); *Kingsbury v. Commissioner,* 65 T.C. 1068, 1081 (1976).

Petitioners have stipulated that they "never held an equity interest in Royal." Nevertheless, petitioners argue that the right to share in the proceeds of a sale of Royal was the "equivalent of an equity interest," even though no stock certificates were issued to them and they have no documentary proof of any equity interest. Petitioners assert that Royal intended to give petitioners something more than only compensation for services. Petitioners support their assertion by noting that under New York corporation law, Mr. Baron, as the sole common shareholder of Royal, had the power to amend Royal's certificate of incorporation in any way necessary to allow petitioners to become shareholders.[10] Mr. Baron, however, never availed himself of

---

[8]Petitioners' reply brief cites three cases; however, those cases were cited in respondent's brief as support for respondent's assertions. Petitioners' reply brief mentions those three cases only in an attempt to distinguish the facts of those cases from the facts herein.

Petitioners' trial memorandum cited *Foy v. Commissioner,* 84 T.C. 50 (1985), and *Turzillo v. Commissioner,* 346 F.2d 884 (6th Cir. 1965), in support of their cases. Petitioners' briefs, however, make no mention of those cases, and we take that as a concession that the facts in *Foy* and *Turzillo* are distinguishable from those of the instant cases.

We do note, however, that the *Turzillo* case involved a taxpayer who was a former employee of a corporation in which he owned Class B stock and had an option to purchase Class A stock. The taxpayer in *Turzillo* received payments from his employer as a settlement of a lawsuit in which the taxpayer had alleged that his employer had breached their employment contract. The Sixth Circuit held that the payments were taxable as capital gains because they were in exchange for the release of the taxpayer's option to acquire the employer's stock. The Coles' tax return listed the payment from Royal as an option; however, petitioners have not cited any law under which their agreements with Royal would give rise to stock options. Thus, we deem that petitioners have conceded that they never possessed any options to purchase stock in Royal, so *Turzillo* is inapposite to them. Petitioners also have not suggested that the rights granted by the employment agreements created a partnership with Royal, and we take that as a concession by them that sec. 741 does not provide a basis for capital gains treatment to apply to the payments at issue.

[9]Royal was incorporated in the State of New York.

[10]Petitioners note that New York Business Corporation Law sec. 508(f) authorizes the ownership of shares of a corporation in the form of "uncertificated shares." Under sec. 508, ownership of a corporation in the form of uncertificated shares is not evidenced by any stock

any such power he may have had; neither he nor Royal ever made any effort to provide petitioners with stock in Royal in their names.

Although petitioners may argue that the substance of a transaction should override the transactional form, this Court requires that a taxpayer produce "strong proof" to overcome the transactional form adopted by a taxpayer. *Illinois Power Co. v. Commissioner*, 87 T.C. 1417, 1430 (1986); *Coleman v. Commissioner*, 87 T.C. 178, 202 (1986), affd. in an unpublished opinion 833 F.2d 303 (3d Cir. 1987); *Bolger v. Commissioner*, 59 T.C. 760, 767 n. 4 (1973). The form of the transaction was cast so that petitioners did not own any equity interest in Royal, and petitioners certainly have not forwarded sufficient evidence to overcome that form.[11]

In support of his argument that the payments constituted ordinary income, respondent relies primarily on *Hill v. Commissioner*, 47 T.C. 613 (1967), and *Freese v. United States*, 455 F.2d 1146 (10th Cir. 1972). In *Hill*, we held that the taxpayer, who was the producer and writer of the television series "Divorce Court," recognized ordinary income, not capital gains, when he received from his employer 5 percent of the net profits accruing from the employer's sale of the "Divorce Court" series. Although we agree with the reasoning of the *Hill* case, we rely instead on the analysis in *Freese* because the facts of the instant cases are almost identical to those of *Freese*, where the 10th Circuit

certificate; rather, sec. 508 only requires the corporation to send written notice to the shareholder as evidence of the ownership of the shares. Sec. 508(f), however, was not enacted until 1982, and was not effective until Sept. 1, 1982, several months after they and Mr. Baron ceased to have any interest in Royal. See N.Y. Business Corporation Law sec. 508, note at 151 (McKinney 1986), referencing 1982 N.Y. Laws ch. 928, sec. 36. Thus, it appears that, under the laws of New York in effect while the employment agreements were in force, there was no provision whereby petitioners could own shares of Royal without stock certificates being issued or transferred to them.

[11]In their briefs, the parties have addressed the rule of *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965). Appeal of the Rothsteins' case would lie in the Third Circuit, so the *Danielson* rule applies to their case. See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The parties disagree about what the appropriate rule should be in the Coles' case, which is appealable to the Second Circuit; however, we need not address whether the Coles have a more rigorous burden of proof than "strong proof." We do not address the requirements of the *Danielson* rule or the rule in the Second Circuit because petitioners have not even overcome the strong proof burden required of them, much less any more rigorous standard that either Court of Appeal might apply.

held that payments pursuant to an employment contract were ordinary income.

Mr. Freese and his employer entered into an employment agreement which provided for a base salary as well as a right to 10 percent of all profits earned by the employer, Bell Oil & Gas Co. (Bell), including income from investments, dividends, and sales of assets. Unlike petitioners, however, Mr. Freese was liable for 10 percent of any net loss of Bell. The assets of the corporation subsequently were sold, but Mr. Freese did not take any part in the negotiations leading to the sale. Mr. Freese and Bell contested the actual amount due under the employment agreement, but they reached a settlement in which Mr. Freese received $555,000 in full satisfaction of the terms of the agreement. Mr. Freese argued that this sum was a capital gain.

The 10th Circuit in *Freese* affirmed the judgment of the trial court and the finding that the only relationship between Mr. Freese and Bell was that of employee-employer. 455 F.2d at 1151. The 10th Circuit noted that the District Court found that "Plaintiff was never a stockholder of Bell. He did not attend and was not invited to attend stockholders' meetings of Bell. Plaintiff was never a member of the board of directors of Bell." 455 F.2d at 1150 n. 1, quoting *Freese v. United States,* 323 F. Supp. 1194, 1197 (N.D. Okla. 1971).[12]

The 10th Circuit concluded that the payment at issue was compensation for services rendered and thus ordinary income. Its conclusion was based on the following analysis:

We have not been content to be governed by the express terms of the contract describing the relationship as employer-employee in deciding whether the distribution qualified as a capital asset. We have proceeded to examine the history and nature of the property itself in an effort to determine its intrinsic nature and character. Regardless of how the matter is considered, we find that its inherent quality is that of deferred commissions and profits. In short, it was an employee profit sharing program. Freese was not granted a ten percent interest in the Bell

---

[12]The courts in *Freese* also noted that the employment agreements provided that Mr. Freese was liable for 10 percent of the losses of Bell. Petitioners in the instant cases arguably had even less of an equity interest in the employer corporation than did Mr. Freese, because they bore no liability for any loss in the value of Royal. See *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1238 (1981); *Harmston v. Commissioner,* 61 T.C. 216, 230 (1973), affd. 528 F.2d 55 (9th Cir. 1976).

Corporation. Instead, he received a ten percent interest in the increased value of assets. * * *

Nor do we agree that Freese's "bundle of rights" gave to this property the quality of a capital asset. The fact that the fund finally had considerable magnitude accumulated over a long period of time, while significant, is not determinative. Nor does the fact that the taxpayer had rights in connection with the computation of the profits attributable to the sale of assets change its quality. Nor can we give weight to the fact that he was a vice-president or acting in a managing capacity. None of these incidents changes the fact that this distribution was made up of commissions and earnings. It remained compensation, even though attributable to the sale of corporate assets of various kinds. The fact of deferment and accumulation cannot change this basic nature or quality.

[455 F.2d at 1151; fn. ref. omitted.]

Like Mr. Freese, petitioners executed employment agreements, were vice presidents acting in a management capacity, were not shareholders, had no rights as shareholders or as corporate directors, yet had the right to share in profits from the sale of their employer's assets. We find that the facts in the instant cases do not differ materially from the facts in *Freese,* and we agree with the reasoning of the 10th Circuit. We find, as in *Freese,* that the only relationship between Royal and petitioners was that of employer-employee and that the rights in Royal granted by the employment agreements were merely rights to receive deferred compensation. As such, those rights do not rise to the level of capital asset status and the extinguishment of those rights is merely payment for services rendered. We therefore hold that the payments were made to petitioners as compensation for services and that the payments are taxable to petitioners as ordinary income for 1982.[13]

Respondent also determined that the Coles were liable for a 10-percent addition to tax pursuant to section 6661(a) for 1982 and 1983. Petitioners have made no reference whatsoever to section 6661, and we deem them to have conceded the issue. Rule 142(a). We therefore find for respondent on this issue.[14]

---

[13]We are confident that we would have reached the same decision if we had relied on our reasoning in *Hill.*

[14]By oral stipulation at trial, the Coles have conceded that they are liable for the additions to tax pursuant to sec. 6653(a)(1) and sec. 6653(a)(2).

To reflect concessions by the parties,

*Decisions will be entered under Rule 155.*