T.C. Memo. 1998-59


UNITED STATES TAX COURT


ESTATE OF ELLIE B. WILLIAMS, DECEASED, ROBERT M.
DRIGGERS, SR., PERSONAL REPRESENTATIVE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 219-96, 220-96,      Filed February 12, 1998.
            221-96.


<u>Larry Smith</u> and <u>Frank B. Metcalf</u>, for petitioners.

<u>Francis Mucciolo</u>, for respondent.

_____

[1] The Court consolidated the following cases herewith for trial, briefing, and opinion: Robert M. Driggers, Sr., Transferee, docket No. 220-96; and Estate of Ellie B. Williams, Donor, docket No. 221-96.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that petitioners are liable for estate and gift tax deficiencies as follows:

Estate of Ellie B. Williams, docket No. 219-96

<u>Deficiency</u>

$157,969.25

Robert M. Driggers, Sr., Transferee, docket No. 220-96

| <u>Year</u> | <u>Deficiency</u> |
|------|------------|
| 1980 | $192,556.20 |
| 1983 | 328,518.00 |

Estate of Ellie B. Williams, Donor, docket No. 221-96

| <u>Year</u> | <u>Deficiency</u> |
|------|------------|
| 1980 | $192,556.20 |
| 1983 | 328,518.00 |

The issues for decision are:

1.   Whether transfers by Ellie B. Williams (decedent) in 1980 and 1983 of undivided one-half interests in timberland to Robert M. Driggers, Sr. (petitioner), were gifts, as respondent contends, or compensation for services, as petitioners contend. We hold that they were gifts.

2.   Whether the fair market values of the undivided one-half interests in timberland decedent gave petitioner in 1980 and

1983 are $211,000 and $221,000, as petitioners contend; $784,700 and $989,662.50, as respondent contends; or some other amounts. We hold that the value of the 1980 gift is $379,960 and the value of the 1983 gift is $486,150.

3.   Whether petitioner is liable as a transferee for decedent's gift tax deficiencies for 1980 and 1983.  We hold that he is.

4.   Whether the fair market value of decedent's undivided one-half interest in 843.26 acres of timberland when she died was $143,000, as petitioners contend; $360,500, as respondent contends; or some other amount.  We hold that the value of the timberland was $177,085.

5.   Whether, as respondent contends, the fair market value of a 1992 Cadillac Brougham was $24,500 at the date of decedent's death.  We hold that it was.

Section references are to the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure.

## I.   FINDINGS OF FACT

### A.   Petitioners

#### 1.   Ellie B. Williams

Ellie B. Williams (decedent) was born in April 1908.  Her husband was Frank Williams (Williams).  They had no children. Williams died on September 4, 1962.  Decedent inherited about

8,700 acres of undeveloped, rural timberland and farmland in Putnam County and Clay County, Florida, from him.

Before he died, Williams leased the timber rights to the 8,700 acres to Hudson Pulp & Paper Co. (Hudson) for 20 years and gave the company an option to lease it for an additional 20 years. The lease was still in effect in 1979. Under the lease, Hudson paid Williams $5 per cord of wood harvested from the property.

### 2. Robert M. Driggers, Sr.

Robert M. Driggers, Sr. (petitioner), lived in Green Cove Springs, Florida, when the petitions were filed in these cases. He was born in 1927 or 1928. Petitioner's wife was Williams' niece.

Petitioner has been in the timber business since he dropped out of school in the seventh grade. He was a business associate of Williams.

### B. The Relationship Between Petitioner and Decedent

#### 1. Business Relationship Between Petitioner and Decedent

Decedent participated very little in Williams' timber business before Williams died in 1962. After Williams died, decedent asked petitioner to help her manage the 8,700 acres. Decedent hired petitioner and initially paid him $50 a week to manage the property, fix the fences, sell or otherwise dispose of

the cattle on the property, protect against the theft of cattle and timber, and cut timber and haul it to the mill.

Around 1963, decedent and petitioner began an arrangement under which petitioner furnished the labor to produce turpentine from the timber on decedent's property. Petitioner and the workers he hired tapped the pine trees on decedent's property to produce sap. They took the sap to processing plants where it was made into turpentine. Decedent received 25 percent of the turpentine receipts, and petitioner received 75 percent. Petitioner paid all of the expenses from his share. Petitioner and decedent had a profit-sharing arrangement from the early or mid-1960's until decedent died in 1992. Petitioner and decedent agreed that petitioner would provide the know-how and labor to manage and exploit decedent's timberland, and they would split the profits.

Petitioner had authority to handle a substantial part of decedent's business affairs. Decedent and petitioner jointly owned some certificates of deposit and a safe deposit box. They had signature authority on each other's accounts in which they deposited money from their business. They each reported their share of profits on their individual Federal income tax returns.

Petitioner managed most of decedent's assets. However, in 1988, decedent had 15 certificates of deposit, 1 checking

account, and 1 money market savings account over which petitioner did not have signature authority at First Union National Bank of Florida. These accounts totaled $1,102,944.03.

Before 1979, Georgia-Pacific acquired Hudson and assumed the timber lease on decedent's property. In 1979, Georgia-Pacific bought 4,200 acres of the property and released the remaining acres from the lease. Georgia-Pacific paid decedent more than $1 million for the 4,200 acres in 1979. Decedent gave $283,000 to petitioner from the proceeds of the sale. After the sale, decedent owned 2,360 acres in Putnam County (the Putnam County property) and 2,315 acres in Clay County (the Clay County property).[2]

Petitioner hired workers to help him harvest timber from the released 4,675 acres. Petitioner divided the profits equally with decedent.

2. Personal Relationship Between Petitioner and Decedent

Petitioner and decedent had a very close personal relationship. Petitioner loved decedent as if she were his mother and she loved him as if he were her son. He took care of her personal matters with no expectation of compensation. For

---

[2] Petitioner testified that decedent owned about 2,300 acres in Putnam County and about 2,200 acres in Clay County after she sold property to Georgia-Pacific. The parties agree, however, that decedent transferred one-half interests in 2,360 acres in Putnam County and 2,315 acres in Clay County to petitioner.

example, he built two homes and bought cars for her, drove her because she could not drive, drove her to visit her three sisters when they were sick, supervised the funeral arrangements for each of her three sisters, gave decedent insulin shots, and cared for her during her final illness.

Decedent died on July 15, 1992. Petitioner was the only person with her when she died.

### 3. The 1980 Transfer From Decedent to Petitioner

Sometime before April 1980, decedent listed 2,283 acres of her land in Putnam County, Florida, for sale at $700 per acre. Petitioner advised decedent to offer the property for sale at that price.

On April 2, 1980, Terry Pacetti (Pacetti), a real estate broker and investor from St. Augustine, contracted to buy the Putnam County property for $700 per acre. Sometime between April 2 and August 1, 1980, Pacetti assigned the contract to Gerald Thompson & Associates (the Thompson partnership), a partnership that included partners who had extensive backgrounds in real estate.

On April 21, 1980, decedent transferred to petitioner an undivided one-half interest in 2,360 acres[3] of the Putnam County

---

[3] Although the deed states that decedent transferred 2,538.4 acres to petitioner, respondent agreed to value the property
(continued...)

property.  Decedent owned the other undivided one-half interest in that property.  The deed of transfer signed by decedent states that the transfer was made in consideration of love and affection.  Petitioner gave decedent no money for the Putnam County property.

The Thompson partnership signed an addendum to the contract on August 1, 1980, after Pacetti assigned it to the partnership. The addendum stated that, as part of the sale, petitioner agreed to buy 7,000 cords of timber for $150,000 from the property being sold to the partnership.

The Thompson partnership bought the 2,283 acres of land on August 1, 1980, for $700 per acre.  Petitioner received no cash from the downpayment and paid $49,000 of his own money to the buyers at the closing on the property.

The Thompson partnership sold 4,000 cords of timber from the Putnam County property to the Lewis Timber Co. after the Thompson partnership bought the Putnam County property.

The Thompson partnership bought the Putnam County property for residential development.  The Thompson partnership applied for, but could not get, zoning for residential development except for the waterfront property released when the partnership bought

---

[3](...continued)
transferred using petitioner's figure of 2,360 acres.

the Putnam County property. In March 1983, the Thompson partnership defaulted on its mortgage and deeded most of the Putnam County property back to decedent and petitioner because the partnership could not get the residential zoning it needed to develop the property and because the property did not have as much timber on it as the realtor (Tom Schifanella) had represented to the buyers. Later that year, petitioner and decedent resold about 400 acres to Gerald Thompson (Thompson) for $300-$400 per acre. Thompson sold that land to other developers at a date not specified in the record for about twice as much as he paid. Decedent and petitioner sold the remaining Putnam County property to Marc K. Massar for $450 per acre at a date not specified in the record.

### 4. The 1983 Transfer From Decedent to Petitioner

On December 7, 1983, decedent transferred to petitioner an undivided one-half interest in the Clay County property. The deed stated that the transfer was made for consideration of $10. The deed had affixed to it a $225 documentary stamp tax dated February 21, 1984. Decedent's use of a $225 documentary stamp tax was a representation that the interest she transferred to petitioner was worth $50,000. Petitioner gave decedent no money for the Clay County property.

In January 1986, decedent and petitioner sold 329.26 acres of the Clay County property to National Training, Inc., for $911.13 per acre. The parcel sold was 95 percent uplands and 5 percent wetlands.

5. Decedent's Gifts of $10,000 to Petitioner in 1987

On February 20, 1987, decedent gave petitioner $10,000. The memo section of the check said "Bequest". On March 8, 1991, decedent again gave petitioner $10,000. Decedent wrote "advancement on inheritance" in the memo section of the check.

6. Decedent's Will

In her will, decedent made small bequests to petitioner's son and granddaughter and other distant relatives. She left most of her estate to petitioner.

When decedent died, she owned an undivided one-half interest in 843 acres of undeveloped, rural land in Clay County (the estate property), about 79 percent (643 acres) of which was wetlands, and a 1992 Cadillac Brougham worth $24,500. She transferred or sold most of the 2,315 acres in Clay County and 2,360 acres in Putnam County before she died.

C. Decedent's Estate and Gift Tax Returns

Decedent did not file gift tax returns or pay gift tax for her 1980 and 1983 transfers to petitioner. After decedent died,

petitioner retained a tax attorney to advise him in his work as personal representative of decedent's estate. The tax attorney discussed the transfers with petitioner, concluded that the transfers were gifts, and prepared gift tax returns. Petitioner and decedent's other personal representative signed both returns and filed them with the Internal Revenue Service in April 1993.

Decedent's personal representatives reported on decedent's estate tax return that she had a gross estate of $869,391.85.

## II.  OPINION

A.  Whether Decedent Made Taxable Gifts in 1980 and 1983 When She Transferred Undivided One-half Interests in Timberland to Petitioner

### 1.  Background and Contentions of the Parties

Respondent determined and contends that decedent's transfers of undivided one-half interests in timberland to petitioner in 1980 and 1983 were taxable gifts. Petitioners contend that decedent made the transfers in the ordinary course of business to compensate petitioner for his many years of work for her and that decedent lacked donative intent.

A transfer of property is not a taxable gift if it is made in the ordinary course of business (i.e., is bona fide, at arm's length, and without donative intent), even if the transfer is for less than adequate and full consideration. Estate of Anderson v.

Commissioner, 8 T.C. 706, 720 (1947); sec. 25.2512-8, Gift Tax
Regs.[4]  Decedent's estate bears the burden of proving that
decedent's transfers to petitioner of undivided interests in
timberland in 1980 and 1983 were not taxable gifts.  Rule 142(a).

Petitioners argue that decedent had good business reasons
for making the transfers.  Petitioners point out that petitioner
had worked for decedent since the early 1960's without
compensation, except for his share of profits (and $50 per week
in the first year), and that decedent could not have managed her
property without petitioner's help.  We disagree that this shows
that the transfers were not gifts.

---

[4] Sec. 25.2512-8, Gift Tax Regs., provides:

SEC. 25.2512-8, Transfers for insufficient consideration.

Transfers reached by the gift tax are not confined to
those only which, being without a valuable consideration,
accord with the common law concept of gifts, but embrace as
well sales, exchanges, and other dispositions of property
for a consideration to the extent that the value of the
property transferred by the donor exceeds the value in money
or money's worth of the consideration given therefor.
However, a sale, exchange, or other transfer of property
made in the ordinary course of business (a transaction which
is bona fide, at arm's length, and free from any donative
intent), will be considered as made for an adequate and full
consideration in money or money's worth.  A consideration
not reducible to a value in money or money's worth, as love
and affection, promise of marriage, etc., is to be wholly
disregarded, and the entire value of the property
transferred constitutes the amount of the gift. * * *

2.   Love and Affection Between Petitioner and Decedent

Decedent and her husband had no children.  After decedent's husband died in 1962, petitioner, whose wife was Williams' niece, handled many important personal matters for decedent.  Petitioner testified that he did not expect to be paid for performing these personal services, and that he loved decedent like a mother and she loved him like a son.  Their close personal relationship suggests that decedent gave interests in the Putnam County and Clay County properties to petitioner out of love and affection.

Decedent was clearly inclined to make gifts to petitioner. Decedent gave $283,000 to petitioner when she sold 4,200 acres of timberland in 1979.  Decedent gave $10,000 to petitioner in 1987 and another $10,000 in 1991 as advances on his inheritance from her.  Decedent left most of her estate to petitioner.  See Cobb v. Commissioner, T.C. Memo. 1985-208 (in deciding whether decedent's grant of an option to buy her farm was a gift, Court considered whether decedent had previously made gifts to the optionee).

Petitioner received 75 percent of the receipts (less expenses) from the sale of turpentine and one-half of the profits from the sale of timber.  Petitioners do not contend that

petitioner's and decedent's business agreement obligated decedent to transfer land to petitioner.

Petitioners cite Cobb v. Commissioner, supra, in which the owner of land granted an option to an unrelated person to buy her farm at less than market value in return for his agreement to manage the farm for her for as long as she owned it. The owner died within a year after the agreement was reached, resulting in a windfall to the option holder. We found that the agreement was made at arm's length for business purposes and without donative intent.

Petitioners' reliance on Cobb is misplaced. In Cobb, the owner gave an option to buy the land as part of a business agreement. Here, decedent was not obligated to transfer any interest in the land to petitioner as part of decedent's business arrangement with petitioner. Also, in contrast to Cobb, decedent and petitioner had a very close personal relationship (like mother and son), and decedent left most of her estate to petitioner.

Petitioners also cite Rev. Rul. 80-196, 1980-2 C.B. 32, and Hull v. Commissioner, T.C. Memo. 1962-199. Petitioners' reliance on Rev. Rul. 80-196, supra, and Hull v. Commissioner, supra, is misplaced. In Rev. Rul. 80-196, the Commissioner ruled that

transfers of stock by a corporation's two shareholders to three employees were not gifts because the transfers were made in the ordinary course of business and were made for adequate and full consideration. The employees had no special, personal relationship with the two shareholders. In contrast, decedent and petitioner had a close personal relationship. In Hull, we held that the taxpayer's transfer of an interest in mineral rights to a family-owned corporation in exchange for an annuity payment of $15,000 per year for life was made in the ordinary course of business, despite the fact that the beneficiaries of the transaction were family members. Hull differs from this case because the issue there was not whether the taxpayer had donative intent when she transferred property for less than its fair market value; indeed, the Commissioner stipulated that the taxpayer believed that she had made a bona fide sale. In contrast, whether decedent had donative intent in making the 1980 and 1983 transfers is in dispute here.

3. Petitioners' Partnership Theory

Petitioners argue that petitioner and decedent formed a partnership and that decedent's transfers of property to him were subject to that partnership. Petitioners point out that a

partnership is created if persons join together their money, goods, labor, or skill to carry on a business and there is a community of interest in the profits and losses. Commissioner v. Tower, 327 U.S. 280, 286 (1946). Petitioners also point out that a partnership may exist if there is joint activity, joint ownership of bank accounts, the sharing of profit and loss, and relinquishment or delegation of management duties to another partner or coowner. Bussing v. Commissioner, 89 T.C. 1050, 1060-1062 (1987); Burde v. Commissioner, 43 T.C. 252, 263, 266 (1964), affd. 352 F.2d 995 (2d Cir. 1965); Brady v. Commissioner, 25 T.C. 682, 688 (1955). Petitioners also cite the Uniform Partnership Act, which identifies three requirements necessary to establish a partnership: (1) The active conduct of a business (2) for profit (3) by two or more persons as coowners. Fla. Stat. Ann. sec. 620.585 (West 1993).

Petitioners' partnership theory misses the mark. First, petitioner and decedent did not form a partnership under Florida law because they did not coown the property used to produce timber and turpentine and they made no agreement to share losses. Second, decedent (and not a partnership) owned the property when she transferred the undivided interests to petitioner. Third,

petitioner and decedent agreed that petitioner would supply the labor to exploit the timber on her property and they would share the proceeds from the sales of timber and turpentine. Decedent's transfer of property to petitioner was not done as part of their business agreement; it was a separate, voluntary act by decedent.

Petitioners point out that petitioner agreed in August 1980 to buy $150,000 worth of timber from the Putnam County property in order to close the sale of the property to the Thompson partnership. Petitioners contend that this shows the April 21, 1980, transfer of the undivided interest in the Putnam County property to petitioner was a business transaction. We disagree; decedent transferred the property to him 3½ months before he agreed to buy the timber. It has not been shown that his agreement to buy timber was foreseeable when decedent transferred the property interest to him. Thus, we do not think the fact that petitioner agreed to buy timber from the Putnam County property supports petitioners' theory that decedent's transfer of the Putnam County property to him was made in the ordinary course of business.

4.  <u>Decedent's Gift Tax Returns and the Opinions of Decedent's Lawyers</u>

Petitioners contend that the lawyers who handled the two transfers did not believe that they were gifts. We disagree. First, the lawyer who prepared the 1980 deed testified that he

did not remember why decedent made the transfer or why the deed listed "love and affection" as the consideration. Second, the lawyer who prepared the 1983 deed testified that he put documentary stamps on it because he thought petitioner had bought the undivided one-half interest he received in 1983; however, petitioner testified that he paid no money for the property.

After decedent died in 1992, petitioner retained a tax attorney to help him in his work as personal representative of decedent's estate. The tax attorney discussed the transfers with petitioner, concluded that the transfers were gifts, and prepared gift tax returns, which petitioner signed and filed with the Internal Revenue Service. Petitioner's signing of the gift tax returns is inconsistent with his position here that the transfers were not gifts.

5. Conclusion

We find that, in light of (a) the fact that decedent did not agree to transfer property to petitioner as part of their business relationship, (b) decedent's personal relationship with petitioner, (c) her history of making gifts to him, and (d) petitioner's signing of the gift tax returns, decedent's transfers to petitioner in 1980 and 1983 were gifts.

B. The Value of the Gifts From Decedent to Petitioner

1. Expert Testimony

Both parties called expert witnesses to give their opinions about the value of the undivided one-half interests in timberland

decedent transferred to petitioner in 1980 and 1983. We may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we will accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986).

There were five expert witnesses at the trial. Three were appraisers: David R. Elmore, Jr. (Elmore), for respondent, and Dr. C. Donald Wiggins (Wiggins) and Philip J. Moses (Moses) for petitioner. The opinions of petitioners' and respondent's appraisers and the positions of the parties[5] are as follows:

|  | Ps' Returns/ Petition | Ps' Experts Moses/Wiggins[1] | Deficiency Notices and Answers | R's Expert Elmore |
|---|---|---|---|---|
| Putnam Co. property | $263,040 ($111.46/ acre) | $211,000 ($89.41/acre) | $759,050 ($321.63/ acre) | $799,000 ($350/acre) |
| Clay Co. property | 276,000 ($119.22/ acre) | 221,000 ($95.46/acre) | 989,662 ($427.50/ acre) | 1,041,750 ($450/acre) |
| Property in estate | 122,400 ($145.15/ acre) | 143,000 ($169.58/ acre) | 360,500 ($427.50/ acre) | 379,467 ($450/acre) |

[1] Moses valued a fee simple interest in the three parcels of property. Wiggins applied discounts for fractional interests in real estate to Moses' values for the three parcels of real property.

Petitioners' other experts were Frank Scruby, a Florida real estate attorney, and Donald Pitts, a Florida banker.

---

[5] Respondent determined in the gift tax notice of deficiency that the 1980 gift consisted of 2,283 acres instead of 2,360 acres. This reduced the amount of the 1980 taxable gift. However, respondent does not now seek an increased deficiency based on 2,360 acres.

2.  Petitioners' Experts

a.  Moses

Moses appraised the Putnam County and Clay County land.  He used a combined income and comparable sales (market data) approach.  He inspected the Putnam County property in 1984 to estimate its volume of timber and all of the properties in question in 1992 to appraise them for estate tax purposes.  He conducted timber cruises in both years to estimate the amount and value of timber on the property.  He considered 15 sales of what he said was similar rural land in North Florida to estimate the value of the property.  Moses concluded that the highest and best use of both properties was agricultural.

Moses did not find any actual sales of undivided or fractional interests in comparable real property.  He concluded that fractional interests in such property are not marketable.

b.  Wiggins

To estimate the fair market value of the three fractional property interests, Wiggins applied a 44-percent discount to one-half of the value of the fee simple estimated by Moses.  Wiggins computed a 44-percent discount through seriatim application of discounts of 30 percent for lack of control and 20 percent for lack of marketability.  He estimated that partition costs would be $164,400 for the Putnam County property, $172,500 for the Clay

County property, and $76,500 for the estate property because the properties are irregularly shaped parcels containing pineland, swampland, and riverfront acreage.

### c.   Scruby

Petitioners' expert, Frank Scruby (Scruby), a Florida attorney with 40 years of real estate experience, estimated that the costs of partitioning would be $23,500 for the Putnam County property transferred in 1980, $23,500 for the Clay County property transferred in 1983, and $17,500 for the real property in decedent's estate in 1992.

### d.   Pitts

Donald M. Pitts (Pitts), a Florida banker for 29 years, testified that banks will not make loans to the owner of a fractional interest in real property without the consent of the other coowner.

### 3.   Respondent's Expert--Elmore

Elmore concluded that the highest and best use of both properties was for timber growth, agriculture, rural residential, and waterfront development purposes.  He used as comparable sales the August 1980 sale of the Putnam County property and a 1979 sale by River Farms, Inc., to Seminole Electric Cooperative, Inc.

He estimated that a fee simple interest in the Putnam County property was worth $1,598,100 ($700 per acre) in 1980. Elmore used sales that he said were comparable to estimate that a fee simple interest in the Clay County property was worth $2,083,500 ($900 per acre) in 1983. He divided both of these amounts in half because decedent gave petitioner an undivided one-half interest in the two properties. Elmore applied no discount to take into account the fact that petitioner received undivided interests in the properties.

4. Value of a Fee Simple Interest in the Land

a. 1980 Transfer--Putnam County Property

Decedent sold the Putnam County property in August 1980 for $1,598,100 ($700 per acre). Respondent argues that this shows that a fee simple interest in the property was worth that amount when decedent transferred a one-half undivided interest in the Putnam County property to petitioner in April 1980. Petitioners contend that a fee simple interest in the Putnam County property was worth $1,096,000 ($464 per acre).

We believe Elmore's use of the August 1980 sale led him to overestimate the value of the Putnam County property. The $700 per acre price exceeded the fair market value because of what

Elmore conceded at trial were unusual contract terms, the effect of which Elmore had not considered.  For example, petitioner bought $150,000 worth of timber and paid almost $50,000 to help the buyers make the downpayment; the buyers obtained an easement across the property to the waterfront property; under the release clauses contained in the owner-financed mortgage, the waterfront property was released from the mortgage when the buyers made the downpayment; and the buyers could keep one-half of the proceeds from all future timber sales (including the mortgaged property) even if they did not complete the sale.  Elmore did not know that Thompson applied for, but could not get, zoning for a residential development except for the waterfront property released at closing; he did not ascertain whether the 7-percent interest charged in the note was consistent with prevailing interest rates in 1980; and he did not conduct a timber cruise to estimate the value of the standing timber.

Elmore also considered as a comparable sale the 1979 sale by River Farms, Inc., to Seminole Electric Cooperative, Inc.  Elmore stated in his report that the buyer bought this property to use as an electric power generation facility.  However, Elmore did not consider whether the Putnam County property could be used for

that purpose.  Elmore did not know the requirements of the Florida Electrical Power Plant Siting Act (Fla. Stat. ch. 403.501-403.518 (1973)) or what criteria must be met before property can be used for a power plant.

We believe that Elmore relied too greatly on the 1980 sale to the Thompson partnership and the 1979 sale of the Seminole property to establish the value of the Putnam County property. We think he should have considered the unusual contract terms of the 1980 sale and whether the Seminole property was comparable to the Putnam County property.

We believe Moses underestimated the value of the Putnam County property because he understated the volume of the timber on it.  He subtracted 4 years of growth from the volume of timber that he estimated was on the property in April 1984 on the erroneous assumption that no timber had been cut from the property during those 4 years.  Petitioner testified that he harvested timber from the property until decedent died.  Moses estimated that the Putnam County property had a total of 3,978.55 cords of pine (3,422.82 of pulpwood and 555.73 cords of sawtimber) in April 1980.  However, petitioner bought 7,000 cords of timber from the Putnam County property in August 1980, and

Lewis Timber Co. bought an additional 4,000 cords from the Putnam County property before the Thompson partnership deeded the Putnam County property back to decedent and petitioner in 1983. Respondent argues that Moses' computation of the volume of timber on the Putnam County property transferred in April 1980 is understated by at least 7,021.45 cords (11,000 - 3,978.55). Using Moses' assumed prices per cord of pulpwood and sawtimber, the value of the additional timber, at $25 per cord for pulpwood, is $175,536.25 or $74.38 per acre ($175,536.25/2,360 acres), or at $45 per cord for sawtimber, is $315,965.25 or $133.88 per acre ($315,965.25/2,360 acres). Thus, respondent contends that Moses' per acre value for the 1980 property should be increased to $538.38 ($464 + $74.38), or $597.88 ($464 + $133.88).

We conclude that the value of a fee simple interest in the Putnam County property was $1,357,000 in 1980 ($575 per acre). Decedent gave petitioner an undivided one-half interest in the Putnam County property. One-half of $1,357,000 is $678,500. We discuss at paragraph II-B-5, below, to what extent we discount the value of the Putnam County property because petitioner received an undivided one-half interest in it.

    b.    1983 Transfer--Clay County Property

Respondent argues, based on sales of comparable properties, that the Clay County property was worth $2,083,500 ($900 per acre) on the date of the gift in 1983. Petitioners contend that

the Clay County property was worth $1,150,555 ($497 per acre) on the date decedent transferred an undivided one-half interest in it to petitioner.

Elmore stated that the Seminole property sold in 1979 and the Putnam County property sold in 1980 to the Thompson partnership were comparable to the Clay County property. For the reasons stated above at paragraph II-B-4-a, we believe that Elmore relied too greatly on these two sales to establish the value of the Clay County property.

Elmore also used as comparable sales decedent's and petitioner's 1986 sale of 329.26 acres of the Clay County property for $911 per acre and the 1982 sale of 2,230 acres from J.P. Hall & Sons, Inc., to Georgia-Pacific for $500 per acre (the Hall property).

Elmore's report states that the Hall property was primarily (about 90 percent) wetlands and that Georgia-Pacific bought the property for its peat deposits, which had an estimated production value of $1,500 per acre. Elmore did not consider whether the Clay County property had peat deposits. The Clay County property was 35 percent wetlands.

Respondent argues that petitioners' suggestion that Georgia-Pacific paid more for the Hall property because it had peat deposits erroneously assumes that Georgia-Pacific would have no production costs. We disagree. Elmore's report states that

Georgia-Pacific bought the Hall property for its peat deposits and clearly supports petitioners' contention that the peat deposits raised the property's sale price.

We believe Moses understated the volume, and thus the value, of the timber on the Clay County property that decedent transferred to petitioner in April 1983. He subtracted 9 years' growth from the volume of the timber on the property in December 1992. He erroneously assumed that no timber had been cut from the property in those 9 years. Petitioner testified that he harvested timber from the property from 1983 until decedent died in July 1992; however, the record does not show how much timber petitioner harvested during those years.

Both Elmore and Moses used as a comparable sale decedent's and petitioner's 1986 sale of 329.26 acres of the Clay County property for $911 per acre.[6]

We believe that the 1986 sale price received by decedent and petitioner for the Clay County parcel ($911 per acre) supports some increase in Moses' estimated per acre value of the Clay County property. However, the 329 acres of Clay County property were more valuable per acre than the Clay County property decedent transferred to petitioner in 1983. The 329-acre parcel

---

[6] Both parties' experts used this post-valuation date sale as a comparable sale. The parties agree that it is relevant in valuing the Clay County property in 1983 when decedent transferred the undivided one-half interest in it to petitioner.

was 95 percent uplands and 5 percent wetlands and was some of the best acreage owned by petitioner and decedent; the Clay County property transferred to petitioner was 21 percent uplands and 79 percent wetlands. The 329-acre parcel sold was virtually unregulated by the Water Management District and other governmental agencies, in contrast to the property transferred which was almost totally regulated by the Water Management District, the Army Corps of Engineers, the Florida Department of Environmental Protection, and the Clay County Planning Department.

We conclude that the value of a fee simple interest in the Clay County property was $1,736,250 ($750 per acre) in 1983. Decedent gave petitioner an undivided one-half interest in the Clay County property. One-half of $1,736,250 is $868,125. We discuss at paragraph II-B-5, below, to what extent the Clay County property should be discounted because petitioner received an undivided one-half interest in it.

5.  Discounts

The applicability and extent of a discount for a fractional interest is a question of fact to be decided based on the entire record. Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975); Estate of Campanari v. Commissioner, 5 T.C. 488, 492 (1945). Courts have held that the sum of all fractional interests can be less than the whole and have used fractional

interest discounts to value undivided interests.  Estate of Bonner v. United States, 84 F.3d 196, 197 (5th Cir. 1996); Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981); see, e.g., Estate of Wildman v. Commissioner, T.C. Memo. 1989-667 (40-percent discount); Estate of van Loben Sels v. Commissioner, T.C. Memo. 1986-501 (60-percent discount).

Respondent offered no evidence relating to the size of the discount that should apply, and concedes that a 5-percent discount should apply.  Petitioners' expert, Wiggins, testified that the value of petitioner's undivided one-half interests in timberland should be discounted by 44 percent.

### a. Whether Petitioners' Property Interests Should Be Discounted Absent Evidence of Actual Sales of Fractional Interests in Real Property

Respondent contends that no discount larger than 5 percent should apply because petitioner offered no evidence of actual sales of fractional interests in real property.  We disagree. Pitts credibly testified that banks generally will not lend money to the owner of a fractional interest in real property without the consent of the coowner.  We believe that Moses' and Pitts' inability to find sales of fractional interests in comparable real property in Florida shows that there was no market for fractional interests in such real property.

Respondent points out that neither Moses nor Elmore applied a discount for a fractional interest in real estate.  We give

little weight to the fact that Moses did not discount the property interests at issue here because petitioner retained him to value the fee simple interests in the properties, not petitioner's or decedent's undivided one-half interests in the properties.

b.   Whether the Discount Should Be Limited to Scruby's Estimate of the Cost of Partitioning the Property Interests

Respondent points out that respondent's 5-percent discount equals $41,300 (2,360 acres x $350 x .05) for the 1980 gift and $52,087.50 (2,315 acres x $450 x .05) for the 1983 gift. Respondent argues that we should not apply a discount greater than 5 percent because the 5-percent discount is greater than petitioners' expert's, Scruby's, estimate of the costs of partitioning the properties.  We disagree.  First, Wiggins estimated that partition costs here would be substantially more than respondent's 5-percent discount, that is, $164,400 for the Putnam County property, $172,500 for the Clay County property, and $76,500 for the estate property.  Second, respondent's 5-percent discount does not give adequate weight to other reasons for discounting a fractional interest in real property, such as lack of control and the historic difficulty of selling an undivided fractional interest in real property, discussed below.

c.   Discounts for Lack of Marketability and Lack of
     Control

Petitioners' expert, Wiggins, testified that the fractional interests at issue here should be discounted by 20 percent due to lack of marketability and by 30 percent for lack of control and the necessity of resorting to partition and related costs to liquidate one's interest, for a total discount of 44 percent.  He concluded that a marketability discount is appropriate because of the 9-month marketing time and 10-percent real estate commission cost involved in selling real property in that particular market. He said that the holder of a fractional interest in real estate lacks control because he or she cannot unilaterally decide how to manage it.  Wiggins noted that a partition action can take a considerable amount of time and expense.  He estimated that partition costs would be $164,400 for the 1980 transfer, $172,500 for the 1983 transfer, and $76,500 for the estate property because the properties are irregularly shaped parcels and contain pineland, swampland, and riverfront acreage.  Respondent did not cross-examine Wiggins or offer any evidence to rebut Wiggins' testimony.  Respondent offered no evidence regarding the size of the discount that should apply here.  See Hess v. Commissioner, 24 B.T.A. 475, 478 (1931) (Court adopted the taxpayer's

contention of value where the Commissioner introduced no evidence to rebut the taxpayer's expert's testimony).

Respondent argues that Wiggins was not qualified to value real property because he is a business appraiser and not a real estate appraiser. Respondent contends that Wiggins provided no factual basis for his conclusions that a 20-percent discount for lack of marketability should apply. Respondent points out that Wiggins included in his report as evidence of the appropriate amount for marketability discounts a discussion of the illiquidity of privately held companies and discounts relating to sales of their stock. Respondent argues that we should give no weight to Wiggins' opinion because he did not consider the marketability of real property. Respondent argues that Wiggins' use of a 30-percent discount for lack of control for the cost of partitioning the properties was not supported by any verifiable data in his reports and far exceeds Scruby's estimated costs of partition.

We disagree that we should disregard Wiggins' report because he is not a real estate appraiser. Wiggins is an experienced business appraiser who has given expert opinions in valuing fractional interests in partnerships, businesses, and real property. We believe that he correctly considered various

factors affecting the potential costs of partitioning the properties in issue. He considered the time and expense of selling real property in that particular market. Wiggins appropriately considered all relevant facts and gave a reasonable explanation for the discount he applied to the property interests at issue here.

Respondent's expert, Elmore, applied no discount to petitioner's and decedent's property interests. He admitted, however, that an undivided one-half interest in real property has a limited market and that a fractional interest may be discounted, although he did not quantify the amount of the discount. This generally supports petitioners' claim that the Putnam and Clay County properties and the estate property should be discounted because they are undivided one-half interests.

        d.   <u>Whether Petitioners' Property Interests Should Be Discounted Because of the Purported Partnership Between Decedent and Petitioner</u>

Petitioners argue that we should discount the Putnam and Clay County properties by more than 44 percent because decedent transferred them to petitioner subject to the purported partnership between decedent and petitioner. We disagree. As discussed at paragraph II-A-3, above, decedent did not contribute any property to a partnership, or make any of her property

"subject to" a partnership.  Thus, we do not consider the part of Wiggins' reports in which he valued partnership interests because they are based on the incorrect assumption that decedent transferred property interests to petitioner subject to a partnership.  See LeFrak v. Commissioner, T.C. Memo. 1993-526 (Court disregarded expert's report because it was premised on the faulty assumption that the seller transferred partnership interests, not interests in real estate).

        e.    Conclusion

We adopt petitioners' contention that a 44-percent discount should be applied to value petitioner's undivided one-half interest in the Putnam County and Clay County properties and decedent's undivided one-half interest in the estate property.

We conclude that the value of petitioner's undivided one-half interest in the Putnam County property in 1980 was $379,960, and in the Clay County property in 1983 was $486,150.

C.    Whether Petitioner Is Liable as a Transferee for Gift Tax

Respondent contends that petitioner is liable for the unpaid gift tax due on decedent's gifts to him in 1980 and 1983.  A donee is personally liable for the payment of gift tax to the extent of the value of the gift to the donee if the gift tax is not paid when due.  Secs. 6324(b), 6901(a)(1)(A)(iii).

Petitioner asserted in his petition that he was not a transferee of the estate of decedent. Petitioners did not brief this issue. We treat this as a concession by petitioners. Rothstein v. Commissioner, 90 T.C. 488, 497 (1988); Reaves v. Commissioner, 31 T.C. 690, 722 (1958), affd. 295 F.2d 336 (5th Cir. 1961). Thus, we hold that petitioner is liable as a transferee for decedent's gift tax relating to decedent's 1980 and 1983 gifts to him.

D.    The Value of Decedent's One-half Interest in the Clay County    Property in Her Estate

The gross estate of a decedent includes the value at the death of the decedent of his or her interest in all property, real or personal, tangible or intangible, wherever situated. Sec. 2031(a). If the interest of the decedent is an undivided minority interest in real property including timber, the amount included in the estate is the fair market value of the undivided interest. See Porter v. Commissioner, 49 T.C. 207, 221 (1967); Estate of May v. Commissioner, 8 T.C. 1099, 1104 (1947); Estate of Campanari v. Commissioner, 5 T.C. at 492.

Respondent contends that decedent's interest in the estate property was worth $758,934 ($900 per acre) when she died. Petitioners contend that decedent's interest in the estate property was worth $510,000 ($604.80 per acre) when she died.

We believe that Elmore overestimated the value of the estate property because none of his comparables had as much wetlands as the 843 acres held by the estate (79 percent). Elmore admitted it would be difficult to develop property with a significant amount of wetlands. The six comparables Elmore considered each had better topography, road frontage, access to utilities, and zoning than the 843 acres held by the estate. One comparable sale used by Elmore was petitioner's 1986 sale of the Clay County property that Elmore and Moses said was superior to the estate property. The buyers of the comparable properties received concessions from the owners (and in one case from the Government) as a condition for paying the purchase price. We think this shows that the prices paid for these properties were more than the fair market value of decedent's property.

We conclude that the value of a fee simple interest in the estate property was $750 per acre in 1992, or $632,445. Decedent owned an undivided one-half interest in the estate property when she died. One-half of $632,445 is $316,223. We discussed at paragraph II-B-5, above, why we apply a 44-percent discount to the Clay County property. We apply a 44-percent discount here for the same reasons. We conclude that the value of the estate property when decedent died was $177,085.

E.    The Value of the Cadillac Brougham

Petitioner offered no evidence that the value of the 1992 Cadillac Brougham when decedent died in July 1992 was not $24,500, as determined by respondent.  The July 1992 Southeastern edition of the N.A.D.A. Official Used Car Guide reports an average retail price of $24,475 for a used 1992 Cadillac Brougham.  We sustain respondent's determination on this issue.

Decisions will be entered under Rule 155.